**Kelly v. Kelly**

C.P. of Berks County, no. 08-947.

*David S. Sobotka,* for plaintiff.
*Jacqueline R. Mark,* for defendant.

LASH, *J.,* August 3, 2010—This court held a custody trial on June 29 and July 30, 2010. At issue was the petition of defendant, Jeffrey Kelly (Father), to modify the custody order entered in this case on July 22, 2008. We enter the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Donine Kelly (Mother), is an adult individual who currently resides at 2867 Pricetown Road, Temple, Berks County, Pennsylvania.

(2) Defendant, Jeffrey Kelly (Father), is an adult individual who currently resides at 259 Wheatfield Road, Sinking Spring, Berks County, Pennsylvania 19608.

(3) The parties are the natural parents of two minor children, Dylan Kelly, born April 2, 2003, and Jaden Kelly, born January 17, 2005, (minor children).

(4) The parties are husband and wife, having been married on June 22, 2002. They resided together until October 28, 2007 when Father moved from the marital residence. A divorce action is pending.

(5) Initially upon separation, Mother remained in the residence and Father obtained an apartment. On February 5, 2008, Mother moved from the marital residence into the home of the maternal grandparents. Shortly thereafter, Father moved back into the marital residence.

(6) In November of 2009, Mother moved from the home of the maternal grandparents into her current residence, which she owns. She resides there with the minor children. The home is suitable for rearing the minor children.

(7) Father currently resides with his paramour, Michele Faust. As stated, the residence is the former marital home and is suitable for rearing the minor children.

(8) Mother's residence is in the Oley Valley School District and Father's is in the Wilson School District.

(9) At all times post-separation, Mother retained primary physical custody of the minor children. Initially, the arrangement was informal, with Father returning to the marital home to visit with the minor children while Mother would run errands. Eventually, Father began taking the minor children to his apartment usually for two nights a week, with the visits eventually extending through overnight.

(10) On or about January 22, 2008, Mother filed a custody complaint, resulting in a custody order entered by this court on July 22, 2008. The order provided, among other things, that Mother would have primary physical custody with Father to have partial custody as follows:

(A) During the school year every Tuesday and Thursday from 4:45 p.m. to 7:15 p.m. and every other weekend from Friday at 4:30 p.m. through Sunday at 6:30 p.m., and

(B) During the summer every Tuesday from 4:30 p.m. to 7:30 p.m. and every other weekend from Friday at 4:30 p.m. through Monday at 9 a.m. Following the weekend of Father's partial custody, Father would have Thursday overnight from 4:00 p.m. through Friday at 4:30 p.m.

(11) The order of July 22, 2008 has been modified to address collateral matters, stemming from several contempt petitions and requests for special relief filed by the parties.

(12) On or about February 10, 2009, Father filed the within petition to modify the order of July 22, 2008, arguing that he should be awarded primary physical custody. Father alleged, among other things, that the minor children want to reside with him, that Mother does not properly care for the minor children, delegating that responsibility to the maternal grandmother, who is not a fit person to care for them, that Mother, as well as the maternal grandmother, make derogatory statements about Father to the minor children, and that Mother is unable to control her anger toward Father which affects the custodial arrangement.

(13) Mother is currently employed as a physical education/health teacher in the Hamburg School District working Mondays through Fridays, from 7 a.m. to 3:30 p.m. The school does provide some flexibility, allowing Mother time off if important matters arise concerning the minor children. Further, Mother does not work during the summer months.

(14) Father is self-employed as a retirement planner, working from his home with flexible full-time hours during the weekdays, working generally from 8:30 a.m. to 4 p.m.

(15) The maternal grandmother provides daycare services for the minor children on weekday mornings from approximately 7 a.m. to 8:30 a.m. until the minor children begin school, then after school for a short period of time until Mother is available from work.

(16) The minor child, Dylan, attends Oley Valley Elementary School. He will be starting the second grade in the 2010-2011 school year.

(17) The minor child, Jaden, attends preschool at Little Angels Academy at the Spring Valley Church of God. Previously, Jaden had attended preschool at Atonement Lutheran Christian Preschool, however, Mother unilaterally transferred Jaden to Little Angels over Father's objection. Previously, the minor child, Dylan, had attended Atonement Lutheran Christian Preschool.

(18) An independent psychological evaluation was performed by Timothy E. Ring, Ed.D. Dr. Ring interviewed the parties, the minor children, Father's paramour, and the maternal grandmother, and reviewed documentation, including information received from medical and educational sources, parental and child questionnaires, and also conducted several tests, including the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the Millon Clinical Multiaxial Inventory—III (MCMI—III), the Ackerman-Schoendorf Scales for Parent Evaluation of Custody (ASPECT), the Bricklin Perceptual Scales (BPS), and the Children's Behavior Checklist (CBCL). Dr. Ring prepared a written report dated January 11, 2010, which was submitted to the court.

## II. DISCUSSION

Both parties are seeking primary physical custody. In making disposition, this court considered the testimony of the parties, the maternal grandmother, Donna Renninger, the paternal grandmother, Lynn Fox, Father's paramour, Michele Faust, Cindy Bickley, the director of Atonement Lutheran Christian Preschool, Christopher J. Spohn, the principal of the Hamburg School District, Aaron Menapace, the athletic director at Hamburg High School, Kelly Kline, Esquire, a friend of Mother's, John

Schroll, a business associate of Father's, the testimony and report of Dr. Ring, and the exhibits submitted by the parties. By agreement of the parties, neither child participated in the proceedings.

Father believes the custody order should be modified to provide that he be the primary custodian for two reasons. First, Father believes he has excellent qualities as a parent and would provide an appropriate home for the minor children. Secondly, Father complains that Mother engages in vindictive and obstreperous conduct, creating difficult and unnecessary obstacles, which hinders his ability to co-parent and which harms the minor children.

Father testified that when the parties' resided together they shared in the caretaking responsibilities. He has been and has always wanted to be extremely involved in all aspects of the minor children's lives. When it is his turn to have custody, he devotes his time and energy in activities with the minor children. He loves them a great deal and has developed an extremely close bond. The paternal grandmother visits and also enjoys a healthy interaction with the minor children. Based on the fact that he works from his home and has an extremely flexible schedule, he is always available for the minor children. He can coordinate his schedule around the minor children's activities and needs.

Father states he wants to work with Mother to provide the minor children with a healthy environment. The parties live only approximately 10 minutes apart and with Father's flexible schedule, there is no reason why the parties should not be able to work together, putting the minor children first.

Father testified, however, that Mother engages in conduct which makes it difficult, if not impossible, to work

in harmony. She makes decisions regarding the minor children without consulting Father. She has been inflexible on numerous occasions, refusing to accommodate Father's needs or modify the custody schedule, even though she would suffer no prejudice from doing so. She and the maternal grandmother have been disparaging toward Father. Mother has been argumentative and emotional, making it difficult to even communicate with her on occasion.

Father cites several examples. Father decided to take the minor children to Disney World. He provided Mother with approximately nine months prior notice of the dates he intended to travel to Florida for this purpose, having arranged to rent a timeshare owned by his business associate, John Schroll. Mother responded by stating that Father should not schedule anything until she decided when she would be taking her vacation, as the custody order provided that Mother's vacation schedule would have priority for the year in question. Subsequently, Mother advised Father that her family was having a get-together at a place at the shore, which conflicted with Father's schedule. The matter could not be resolved amicably and ultimately, Father was required to return from Disney World two days early. As it turned out, Mother misrepresented the dates. Her vacation did not actually start until after Father's return date. The dispute caused Father to have to obtain new airline tickets at an additional cost of $600. This matter was a basis for Father's filing a petition for contempt of court, which is pending before the court and shall be resolved by separate order.

On another occasion, Father volunteered to participate in the "watch dog" program at Dylan's school. The pro-

gram permits fathers to share in the daily scheduled activities of the minor child for the entire school day. At the end of the school day, school personnel approached Father and asked whether he wanted to take Dylan with him, rather than have Dylan ride the school bus home. Father welcomed that idea and took Dylan. Under the customary practice of the parties, Dylan would normally ride the school bus to the home of the maternal grandmother and would stay there until Mother would pick him up. In this instance, Father drove directly to the maternal grandmother's house, getting there prior to the time the school bus would have dropped off the minor child. The maternal grandmother was home and received the minor child. Even though Father did nothing but transport the minor child, and even though the minor child got home from school early, not late, and that there were no other problems, Mother nevertheless contacted the school advising the school that the school permitting Father to take the minor child home with him was a violation of the court order. The school responded by restricting Father from access to the school for any purpose.

On another occasion, Father prepared to celebrate the birthday of one of the minor children at his home, by also including a birthday celebration for Father's dog. Unfortunately, shortly before the celebration, the dog died. Under the custody schedule, Father would not have seen the minor children prior to the birthday celebration. He wanted to meet with the minor children in person to advise them of the dog's death prior to the birthday celebration to permit them time to grieve and to prevent the birthday celebration from being affected more than what was necessary. Father requested some time to meet with

the minor children, for as short a time as one hour, to advise them of the dog's death. Mother initially would not respond, then finally reluctantly agreed, but insisted on make-up time.

Another matter which resulted in a petition for contempt was Mother's unilateral decision to transfer Jaden from Atonement Preschool to Little Angel's Preschool. According to Father, Mother's stated reason was that the Little Angel's Preschool was closer to her home. Father raised concerns. First, the elder minor child had thrived at Atonement, the parties had previously agreed that both minor children would attend Atonement, and there was no reason to transfer him. Secondly, Father perceived that the religious doctrine provided by Little Angels was substantially different from Atonement Lutheran. Most importantly, Father objected because Mother chose to do this without first discussing the matter with him. The matter proceeded to court. The court advised the parties to try to work this out by agreement, with the help of Dr. Ring, who at that time was engaged in the evaluation process. No agreement was reached. Nevertheless, Mother, without court approval or Father's consent, unilaterally transferred Jaden to Little Angels.

In a similar manner, Mother cut off the paternal grandmother from her role as baby sitter. At a time when Father was employed at a bank, both parties were unavailable during the day to care for the minor children. The two grandmothers shared baby-sitting duties and, in fact, the paternal grandmother watched the minor children for as much as three days per week. Without explanation and without prior notice to Father or the paternal grandmother, Mother contacted the paternal grandmother to

advise her that her "services" were no longer required. Since that time, Mother and the paternal grandmother have had only sporadic contact. The paternal grandmother's contact with the minor children is solely through Father.

Father believes that Mother's actions demonstrate her need to control the minor children's lives and Father and his mother's involvement with them. Her actions are not based on any sense of what is best for the minor children but solely out of her controlling nature and vindictiveness. Father states that he is trying to work with Mother and work through these issues, but has been unable to do so.

Father also has concerns about the maternal grandmother. He believes she is overly meddlesome. Further, she is inclined to make negative statements about Father. Father believes her involvement can be harmful to the minor children.

As stated, Mother seeks to retain primary custody of the minor children, although she is willing to grant Father additional time. In her presentation, she sets forth that she has been the parent primarily responsible for the care and the maintenance of the minor children, both before and after the parties' separation. She disputes Father's testimony that they ever shared the parenting responsibilities. In fact, she moved to reduce her employment duties to part-time during the school year to enable her to spend more time with the minor children. Conversely, when Father isn't working, he is often engaged in his own recreational activities, including playing softball, basketball, golf, cards or other activities with his friends. Recently, Father has become more involved, which, ac-

cording to Mother, occurred after he filed the petition to modify.

Mother also posits that the quality of her parenting has been exceptional. She has an extremely close bond with the minor children. She is very attentive to the minor children's educational needs. For example, her basis for seeking to have Jaden transferred from the Atonement preschool to Little Angels preschool was her perception that Atonement did not adequately prepare the parties' other child, Dylan, for his entrance into the elementary school system. She believed that his understanding of the alphabet, and corresponding reading and writing skills, was not at an acceptable level. As a result, she tutored Dylan over the summer prior to his commencement in Kindergarten.

Mother has been the parent involved in the minor children's medical needs. She has been active in enrolling the minor children in extracurricular sporting activities and attends their practices and games. She oversees every aspect of the minor children's lives. As a teacher, she brings a strong background for interacting with children, communicating with them, helping them to grow, in addition to the obvious educational advantages. She is also well organized and maintains appropriate and consistent discipline for the minor children.

Mother disputes Father's categorization of her as hostile toward him and inflexible in working with him as a co-parent. Regarding the preschool transfer issue, Mother believes her reasoning was appropriate. After the parties agreed, with the court's approval, to have Dr. Ring make a recommendation on this issue, Mother sought to get an answer from Dr. Ring but was unable to do so

prior to the deadline for enrolling Jaden. Accordingly, she enrolled Jaden in both schools, and continued to seek Dr. Ring's recommendation, finally advising him that if she did not hear from him within a certain time frame, she would assume that her enrollment of Jaden in a new preschool would be acceptable. When she heard nothing from Dr . Ring, she considered the matter closed.

Regarding Father's Disney trip, Mother believes she acted appropriately and in the best interests of the minor children by requiring Father to return early from the trip. According to Mother, Father was initially out of order by scheduling the Disney trip prior to Mother scheduling her vacation, due to the custody order providing that Mother would have first choice of the vacation dates during the year in question. Mother did not believe that she should have to work around Father's schedule when she had priority for that year, particularly since there were issues that she had to resolve for her vacation schedule, such as coordinating with other family members who also had custodial schedules to consider, and discounts she could receive if she scheduled her vacation on certain weeks. Subsequently, after her schedule was determined, she noted that her vacation would commence immediately after Father's return from Disney. She believed that the minor children would not have enough time to rest from the Disney trip prior to commencing another vacation with her. Accordingly, she felt it appropriate to require Father to return two days early to give the minor children an appropriate rest time.

Regarding Father's transporting Dylan home from school, rather than have him ride the school bus at the

expiration of the watch dog program, Mother states that Father's taking the minor child home from school was a violation of the custody order. Accordingly, she contacted the school and advised them of this. They then responded by ruling that Father would not be permitted to visit the minor child at school for the watch dog program or for any other reason. However, Mother had no problem with Father visiting the minor child at school, merely taking him from the school prior to his scheduled appointed time under the custody order. Accordingly, she contacted the school and followed through with legal documentation setting forth that Father could continue in the watch dog program and otherwise visit with the minor child.

Regarding Father's request that he be permitted additional time with the minor children prior to Jaden's birthday party to advise them of the death of Father's dog, Mother testified that she had no problem with Father's request and believed that it was appropriate. However, Mother did not want Father to discuss this until immediately prior to Father's party, as Mother had also scheduled a birthday party for Jaden the weekend prior to Father's party, and did not want her party ruined by the bad news. She states that she had no problem with Father having the entire night, switching nights with her, and disputes Father's statement that he was limited to a one hour conference with the minor children.

Mother admits that she ended the paternal grandmother's caretaking of the minor children, deciding that this was best because the arrangement was becoming impractical, requiring the minor children to unnecessarily travel to several households.

Mother does not accept Father's representation that he is willing and capable of becoming the primary custodian, to assume the same caretaking responsibilities that have been done by Mother over the years. Mother sees Father as a man who wants to have time with the minor children, to have fun with the minor children, but one with little interest in performing the difficult duties of parenting. She testified that Father did not attend many of the doctors' visits, even though she advised him of the dates and times. While he attended some of the minor children's sporting events, he also is sometimes absent, and would also leave early to participate in his own sporting events. Additionally, Father would object to activities, such as soccer, if the practices or games were held on nights he had the minor children. According to Mother, Father would have to have Mother keep him updated on the minor children's schedules, even though he had schedules made available to him previously. In essence, the theme of Mother's presentation was that Father talks a good game, but continues to be dependent upon Mother to maintain appropriate structure for the minor children.

Dr. Ring was very instructive in both his report and his testimony. He perceives that both parents are "good people" and have strong parenting skills. Mother's parenting method is more structured. She has a strong dedication to her minor children. Father is less structured, providing spontaneity, affection and enthusiasm. Dr. Ring states: "This man likes to have fun with his children and clearly, they know that about their father. " Both parents' styles sufficiently address the minor children's needs.

However, Dr. Ring has serious concerns about the parties ability to interact. There is a lack of communica-

tion. There is also a substantial amount of mistrust and lack of cooperation, which Dr. Ring primarily attributes to Mother. When considering Mother's inability or refusal to work with Father, Dr. Ring chose very strong words in his testimony, labeling Mother as a "horrible co-parenting candidate." He cited Mother's position on the Disney World episode as "absurd." Mother's actions apparently stem from several factors, including her perception that Father cheated on her during the marriage, that he was not committed to her or the minor children, that she had to treat Father as "another child" which she had to parent, and that during the marriage, he would rather be out with his friends rather than investing his time or efforts with the family. She is resentful that she got into the marriage, that she committed to him, including paying off his debt and buying a home, while in exchange, he made little or no sacrifice. Dr. Ring also observed that the maternal grandmother fuels Mother's "fire of resentment."

Dr. Ring recommends that the parties share legal custody, with Mother to have primary physical custody and Father to have an increase in parenting time, possibly overnights on his Thursdays. Dr. Ring also expresses that the parties need therapeutic support, in the form of a parent coordinator, who would be present to make decisions on relatively minor matters when the parties cannot agree. Finally, Dr. Ring recommends that the maternal grandmother should stay out of the parties' business and, particularly, refrain from making negative statements regarding Father, particularly in the presence of the minor children.

In his testimony, Dr. Ring went further. He stated that, in a general sense, a shared physical custody arrangement

should be an option, given each parties' strong parenting skills and the strong attachment the minor children have to both parents. However, he declined to recommend shared physical custody because of the strained relationship of the parties, falling back on the current arrangement with Mother as primary custodian, due to her dedication and skill in addressing the minor children's needs, and to retain continuity and stability. However, as Mother is the catalyst for the parties' relationship issues, Dr. Ring's recommendation poses an irony. Being named as the primary custodian in lieu of shared custody awards Mother a benefit directly resulting from the conflict she is creating. Dr. Ring also warns that if the parties' relationship does not improve, the minor children's psychological and emotional health will be affected, and by the time they are teenagers, substantial problems will manifest.

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

It is abundantly clear from this record that the overriding concern jeopardizing the continued welfare of these minor children is the parties' inability to trust each other, to communicate, or to work as co-parents. Taken separately, either party would be considered a good parent. Mother's parenting skills are exceptional and supe-

rior to Father's, As her presentation attests, which this court accepts, Mother is attentive, disciplined, and educated on the minor children and their issues. She is organized and consistent. She has developed short and long-range goals for the minor children and executes on those goals. In the meantime, she is affectionate and loving. The minor children have a tremendous bond with her. For his part, Father also has an exceptional relationship with the minor children. Although not as organized or focused as Mother, Father is quite capable of taking care of the minor children on a full-time basis.

However, rather than recognize each party's strengths, the parties refuse to cooperate, continuing to build animosity, and causing potential harm to the minor children. Father resents Mother for being inflexible, micromanaging the minor children's lives, and attempting to control him. Mother has little respect for Father, whom she perceives as another child, who wants to go out and play, whether it's with his friends or with the minor children, but is not willing to put the necessary time and effort into being a proper parent.

The parties' criticisms of each other has some merit. In Mother's case, her reaction to Father bringing Dylan home from school rather than having him ride on the school bus was an overreaction. All Father did was transport the minor child to the maternal grandmother's home, without any deviation. Mother should have seen this as an opportunity for Father to spend some time with his child at the end of the watch dog program, and as a positive. Instead, she saw it as a violation, angering her enough to complain to the school and create acrimony when none was necessary.

The Disney incident also represented Mother's inflexibility. Initially, both parties were inflexible, as Mother should have tried to work around Father's schedule, particularly since he gave her plenty of notice, although Father could also have been more flexible and have been willing to switch times, which he apparently was able to do. That being said, there was no reason to require Father to return early and shorten what was otherwise a wonderful trip for the minor children, costing Father unnecessary funds, particularly in light of her own testimony that one factor in her choice as vacation dates was to save herself approximately $400.

Mother's removal of the paternal grandmother as a caretaker was also highhanded. This was not simply firing a baby sitter, this involved the paternal grandmother who also loves the minor children and has a strong bond with them. If the concerns were merely logistical, as suggested by Mother, the parties could have sat down and worked out some alternative arrangement.

Regarding Father, this court agrees that Father has not established the presence of parental skills to the same extent as Mother. If he expects to have Mother consider him as an equal partner, his focus and commitment must improve. We find that Father can also be difficult to deal with, as evidenced by the incident involving the minor children learning of the death of the dog. Both parties clearly recognized that the news would be traumatic to the minor children. Both parties also recognized that the timing was very important. However, Father failed to consider Mother's needs regarding her party for Jaden, construing Mother's insistence on the timing, as Mother simply being difficult. If the parties were able to com-

municate, this matter could have been handled very easily.

Father also apparently refused to hear Mother out regarding her transfer of Jaden to the new preschool. If Atonement had failed to adequately prepare Dylan for school, then Mother's concerns were reasonable. Once again, Father dismissed Mother's opinion as mere evidence of her attempting to control and make unilateral decisions.

Having considered all of these factors, this court finds that Mother is best suited to retain primary physical custody. As stated, her parenting method is superlative. Father has not demonstrated the same commitment or capacity. Significantly, Dr. Ring recommended that Mother have primary physical custody, even after factoring in his pointed criticism about Mother's hostility and disrespect toward Father.

That being said, it is imperative that Mother set aside her opinion of Father and treat him as a co-equal, for the minor children's sake. She is simply not entitled to foreclose Father from having an equal say in important decisions regarding the minor children. She must also learn to work with Father, to be more flexible, to consider the "spirit" of the custody order rather than the letter, when appropriate. We caution that if Mother's conduct toward Father does not improve, that it could be a basis for revisiting the order. Additionally, the maternal grandmother's meddling shall cease. If she continues, it could result in her being restricted from access to the minor children.

Father will also have to adapt his approach. His involvement has improved and it should continue. He, as

well as Mother, should listen to what the other party has to say, rather than simply dismiss it as another attack.

Father's partial custody time should be expanded in accordance with Mother's proposed schedule. Accordingly, we enter the following order:

## ORDER

And now, August 3, 2010, after trial held, it is hereby ordered that the rights and duties of the parties to their minor children, Dylan Kelly, born April 2, 2003, and Jaden Kelly, born January 17, 2005, (minor children), shall be as follows:

(1) The parties shall share legal custody of the minor children.

(2) Plaintiff, Donine Kelly (Mother), shall have primary physical custody of the minor children.

(3) Defendant, Jeffrey Kelly (Father), shall have partial custody consisting of:

(A) During the school year, Week 1—Tuesday from 4:30 p.m. to 7:15 p.m. and Thursday overnight from 4:30 p.m. to Friday at 9 a.m. (Father takes the minor children to school on Friday);

(B) During the school year, Week 2—Tuesday from 4:30 p.m. to 7:15 p.m. and Thursday from 4:30 p.m. to 7:15 p.m. and Friday from 4:30 p.m. to Sunday at 6:30 p.m.;

(C) During the school year, if the minor children are off from school and Mother is working, then Father will be permitted to have the minor children for the day instead of his scheduled evening time. If it is a day that

Father does not have custody and the minor children are off from school, then Father would have the minor children until Mother has finished work;

(D) Summer schedule—Week 1—Tuesday from 4:30 p.m. to 7:30 p.m. and Thursday at 4:30 p.m. overnight to Friday at 4:30 p.m.; and

(E) Summer schedule—Week 2—Monday from 4:30 p.m. overnight to Tuesday at 4:30 p.m. and Friday at 4:30 p.m. to Monday at 9 a.m. (extended weekend).

(4) The parties shall share the following holidays as follows:

(A) Easter: period of custody shall divided as the Saturday prior beginning at 4:30 p.m. to Easter Sunday at 11:30 a.m. (beginning time period); and Easter Sunday from 11:30 a.m. to 7:30 p.m. Sunday evening. Mother shall have the beginning time period in odd-numbered years and Father shall have the beginning time period in even-numbered years.

(B) Memorial Day/4th of July/Labor Day: period of custody shall be from 10 a.m. to 7 p.m. with Mother having 4th of July on even-numbered years and Mother having Memorial Day and Labor Day on odd-numbered years. Father will have 4th of July on odd-numbered years and Father will have Memorial Day and Labor Day on even-numbered years.

(C) Thanksgiving: period of custody shall be from night prior beginning at 4:30 p.m. to Thanksgiving at 11:30 a.m. (beginning time period); and Thanksgiving from 11:30 a.m. to 7:30 p.m. with Mother having the beginning time period in odd-numbered years and Father

having the beginning time period in even-numbered years.

(D) Christmas: period of custody shall be from noon on Christmas Eve Day until Christmas at noon (beginning time period); and Christmas at noon until December 26 at noon. Mother shall have the beginning time period in even years and Father shall have the beginning time period in odd years.

(E) The parties acknowledge and agree that should any of the within designated holidays occur on a Monday immediately following a parties' partial custody weekend, then in that event the party having partial custody shall maintain custody of the minor children for that holiday Monday until 4 p.m.

(5) Mother's Day/Father's Day: Mother shall have custody on Mother's Day and Father shall have custody on Father's Day each year. The time period shall be from 10 a.m. to 7 p.m.

(6) Vacation: The parties shall have the right to one week vacation consisting of seven consecutive days each year during the summer. Each party shall provide the other with at least 90 days written advance notice of their choice under this paragraph. In the event of a conflict, Father's choice shall prevail in even-numbered years and Mother's choice shall prevail in odd-numbered years.

(7) Reasonable telephone contact: The parent having physical custody of the minor children shall make reasonable efforts to maintain an open phone line in his/her residence from 7:40 p.m. until 8 p.m. each evening so that the minor children may place calls to, or receive calls from, the other parent. In the event the minor chil-

dren are unavailable during that time, the parent having custody shall use an answering machine/voicemail to receive messages from the other parent. The parent having custody shall ensure that the minor children are aware of any missed calls as soon as possible. Neither party shall use caller ID, call block, or any other device or service which limits telephone access to the minor children. Each child shall be permitted to speak for a minimum of 10 minutes with the other parent, unless the minor children choose to conclude the call at an earlier time.

(8) Transportation: The parties shall equally share transportation of the minor children. Unless otherwise agreed, the party taking custody shall be responsible for picking up the minor children from the other party at the commencement of their period of partial custody.

(9) Extracurricular: The parties shall consult with each other prior to enrolling the minor children in any extracurricular activities and said enrollment shall be by agreement of the parties. Each party shall have the right to attend educational and extracurricular activities, including but not limited to watch dogs, field trips, classroom events, and all other activities where parents are welcome to visit or participate.

(10) The attached appendix shall be made a part of the within order.

## APPENDIX

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could

constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the children:

(A) The right to reasonable telephone contact with the children when they are in the other parent's custody.

(B) The right to be fully informed concerning the progress of the children in school and the children's medical status, including the right to obtain the necessary information directly from the children's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the children and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the children at any time, any party then having custody of the children shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the children as he or she desires consistent with the proper medical care of the children.

(3) Neither party shall alienate nor permit to attempt to alienate the children from the other party. While in the presence of the children, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the children should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the children out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

(6) The parties shall, at all times, consider the children's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their children proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the children to make choices and run the risk of parental displeasure. However, the children shall be consulted as to their schedules when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor children.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children to unnecessary apprehension and failure of expectations.

(D) The party having custody of the children should prepare them both physically and mentally for the transfer of custody to the other party and have them available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.